[Civ. No. 2717.   Fourth Dist.   Sept. 2, 1941.]

A. G. BLAIR, Appellant, v. SECURITY TRUST & SAV-INGS BANK OF SAN DIEGO (a Banking Corporation) et al., Respondents.

J. A. Donnelley and B. Kenneth Goodman for Appellant.

Lindley & Higgins and George A. Lazar, Jr., for Respondents.

BARNARD, P. J.—This is an action to recover $10,000 for services alleged to have been performed for the defendant bank. A motion for a nonsuit was granted and the plaintiff has appealed from the ensuing judgment. The material facts center around the sale of the land, buildings and equipment of the San Diego Army & Navy Academy, a private military school which for many years had been operated in San Diego. The property consisted of 40 acres of land with extensive buildings, and certain school equipment. The school was owned by a corporation, practically all of the stock of which was owned by two brothers named Davis, who formerly operated the school. The bank held a trust deed and chattel mortgage covering all of the school property, securing a debt of about $111,000, and there were unsecured creditors with claims totaling about $130,000.

Prior to the time here in question financial difficulties had led to the placing of representatives of the creditors upon the board of directors of this corporation. Of the eight directors, one was a representative of the bank, five were representatives of the unsecured creditors, and the other two were the Davis brothers. While the affairs of the school were in this condition the Davis brothers went a few miles away and started a new military school in a building owned by the appellant, which had formerly been used as a hotel. Shortly thereafter, the appellant called on the president of the respondent bank saying that he wanted to get the facts in connection with the bank's interest in the school.

The parties differ somewhat as to what was said at that first conversation. The president of the bank testified that Blair made an inquiry about the Davises and then said he felt he could sell the school to "Cal. Tech.," and that he told Blair that if he could sell it for cash to the amount of the indebtedness they would pay him $10,000. The appellant testified that he told the president that he had come to see him about the school; that the president remarked that he wished they were out of the school business and then said: "Mr. Blair, if you can get us out of the school business it will be worth $10,000, or we will pay you $10,000 if you will

get us out of the school business"; that he asked the president "how much money will it take to get you out of the school business"; that the president replied that he thought $125,000 would do it; and that he told the president that in order to get them out of their school troubles he would have to find a buyer for the school.

Shortly after this conversation the appellant procured photographs of the school buildings for the purpose of showing them to prospects whom he thought he might interest in taking over the school. He testified that he endeavored to present the matter to officials of "Cal. Tech." and of Pomona College and that he then contacted John E. Brown, who had a school in Arkansas and desired to acquire one in California. Brown inquired what the school could be bought for and the respondent told him it would take in the neighborhood of $125,000, or maybe less. At the respondent's suggestion Brown came to San Diego and took the matter up with the officers of the bank. Negotiations for the sale of the school then continued over several months. The appellant was particularly active in negotiations with the unsecured creditors. On the first of February, 1937, the president of the bank told the appellant that "Mr. Brown doesn't want to buy the property, he wrote me that he was through." The appellant then told the president that he had talked to Brown on the previous day and that he "was of the impression that if a definite deal could be made, Mr. Brown would take the place." The appellant seems to have dropped out of the negotiations at that point and he testified that he did not know until afterward when or where the deal was closed. The negotiations continued, however, and the school and its properties were sold to a corporation controlled by Brown, and the respondent bank took back a trust deed executed by that corporation securing a note for $114,000. Apparently, some arrangement was made with the unsecured creditors of the former school and the Davises were given the right to use the name "San Diego Army & Navy Academy" in connection with the new school they had started. The deal was closed on March 4, 1937, at which time the school property was all conveyed to Brown's corporation, the new trust deed for $114,000 was delivered to the bank, and Brown took possession of the property.

While on the witness stand the appellant was asked what the "deal" to which he had frequently referred was and

whether it was not "the sale of the San Diego Army & Navy Academy, the land and buildings and the whole thing to John E. Brown Colleges," to which he replied: "I understood so." He further testified:

"Q. And the final result of all of it, according to your contention is that it resulted in the sale of the school to the John E. Brown College.

"A. Yes sir.

"Q. And when that sale was completed it is your contention that you then had earned the ten thousand dollars?

"A. Yes sir."

On May 7, 1937, the appellant wrote a letter to the president of the respondent bank, a part of which reads:

"For several days I have been much disturbed whenever I think of the great amount of time and money expended to bring about the sale of the S. D. Army & Navy Academy for your institution.

"When I first discussed the selling of the Academy property with you, in your second floor office, you were very anxious for me to find you a customer and you frankly stated you would pay me Ten Thousand Dollars if I found a buyer.

"As my previous experiences with bank officials has always been entirely satisfactory I did not ask you to put your offer in writing, which I now regret exceedingly. I believed you implicitly and I cannot bring myself now to believe that you desire to avoid paying me anything.

"The benefit to the bank by my securing a good buyer for the school is one that will be lasting. The community will also be benefited by the new school; therefore, it does not seem reasonable that you as president of the bank, who is so greatly benefited, should want to ignore your promise. It would seem only fitting that you should want to show your appreciation in a substantial way.

"Many times when Mr. Brown lost interest in purchasing the Academy due to changing proposals, it was through my diplomacy that he was brought back into the deal, and the sale consummated."

The letter further suggested that it was only fair that the bank should be willing to pay for this service and stated that a copy was being sent to all of the directors of the bank in the hope that they "will be more inclined to favor justice and a square deal."

It appears without conflict that the appellant went to the bank in the first place because he was interested in the Davises and in the success of their new school, and he told the banker that it would improve his own position if a deal could be made whereby the Davises could get the use of the name ''San Diego Army & Navy Academy.'' The appellant testified that he had rented his building to the new school started by the Davises, the rental to be a percentage of the gross income. During the negotiations he told one of the witnesses that his interest in the deal was to get a tenant for his property and told several other witnesses that he was getting nothing out of the deal ''except a good turn for everybody.''

This action was filed on March 20, 1939, more than two years after this deal was consummated. It is conceded that the appellant was not licensed as a real estate broker or salesman and that there was no written agreement or memorandum between him and the respondents. An agreement authorizing or employing an agent to sell real estate for a compensation which is not in writing is invalid. (Civ. Code., sec. 1624.) It is unlawful for any person to engage in the business or assume to act as a real estate broker or salesman without having the proper license. (Deering's General Laws, Act 112, sec. 1.)

While the appellant now contends that his activities in this connection did not consist in selling real estate, except incidentally, it clearly appears from the evidence that from the beginning and throughout that was the only thing he attempted to do and that he fully understood that this was what he was doing. The main thing that was done and the only thing that made the deal at all possible was the selling of real property, and there was incidentally involved a small amount of personal property consisting of school equipment. Aside from the other evidence, the appellant's letter of May 7, 1937, discloses that he understood from the beginning that he was to find a buyer for the school property, that he claimed to have done so, that he was asking some compensation for having found a buyer, and that he recognized that he was not legally entitled to such compensation. It is significant that he based his request for compensation upon that ground, and that in this letter he does not refer to or claim the existence of any agreement or understanding other than in relation to his finding a buyer and selling the property. In effect, he asks

the respondents to voluntarily give him something for his services, although he had no written contract, on the ground that they were of value to the bank. We think it sufficiently appears from the evidence that the agreement between these parties, if one there was, was invalid and that a recovery thereon is barred under the statutes above referred to.

The appellant now contends, however, that the oral agreement in question was not one for the sale of real property, but was an agreement "whereby the obligation owing the defendant bank by the San Diego Army & Navy Academy was to be refinanced through the efforts of the plaintiff, and whereby the bank would be relieved from the burden of sharing in the operation of the San Diego Army & Navy Academy." It is contended that the appellant merely contracted to refinance the school's indebtedness to the bank and to get the bank "out of the school business," and that "the record clearly shows that he was to receive a fixed sum on the refinancing of the bank's obligation, however that might be brought about."

There is no evidence in the record that anything was said at the time the agreement was supposed to have been made about refinancing the school's debt to the bank and we can find no evidence that anything was ever later said about any such refinancing, insofar as the appellant is concerned. Moreover, when the deal was closed the respondent bank held a new trust deed on the same property for a larger amount than that secured by the old trust deed. It is hardly reasonable to suppose that the respondents would agree to pay $10,000 for such a "refinancing" which they could doubtless have secured at any time. The only thing that was said, according to the appellant's testimony, was that he was told that if he could get them out of the school business they would pay him $10,000.

It clearly appears that what was meant by getting them "out of the school business" was to get back for them the money which had been loaned in connection with this school, amounting to $111,000 and some interest. The expression thus used did not, as appellant argues, refer to the removal of the bank's representative from the directorate of the school. The bank could have withdrawn this representative at any time without paying anyone for the privilege. It not only clearly appears what the bank official understood by getting it out of the school business, but it clearly appears that the

appellant understood the same thing. When the proposition was made to him he asked how much money it would take to do that and was told that it would take about $125,000. He then told the president that the only way to accomplish this purpose was for him to find a buyer for the school. When the deal was finally closed the bank still had $114,000 tied up in this school business and the only possible advantage to the bank was that because of the sale of the property the new debtor might prove to be more satisfactory. If the agreement was as now contended for by the appellant, and not one for the sale of property, the appellant did not comply with that agreement and did not get the bank out of the school business in the sense that both parties understood and intended. The appellant failed to sustain the burden of proof resting upon him and the motion for nonsuit was properly granted.

A further consideration is that in any event the action was barred by the statute of limitations. If we assume that the appellant complied with his present interpretation of the contract and by his services got the respondent bank out of the school business his services were all performed and his compensation earned when the deal was consummated on March 4, 1937, which was more than two years before this action was begun. The appellant argues that the deal was not concluded until March 22, 1937, because the respondent bank did not record its new trust deed and secure a policy of title insurance until that date. There was no escrow, the papers were passed, possession was given on March 4, 1937; and when the respondent bank chose to record its trust deed, and whether or not it ever secured a policy of title insurance, are not material. So far as the record shows, the appellant made no claim that any agreement was involved, other than for the sale of this property, until more than two years after the transaction in which he claims to have performed services for the respondents was completed and closed.

The president of the bank testified that in their first conversation when he told the appellant it would be worth $10,000 to them if he could sell the school for cash in the amount of the indebtedness the appellant replied that he did not have a broker's license, and that he could not work in that way or accept a commission. This was not denied by the appellant and his subsequent statements and conduct, to

which we have referred, indicate that his real interest in the transaction was to release the Davises from their old debt and secure the name of the old school for the new one which had been started in the building he owned, and suggest that his activities were carried on with that object in view rather than in the performance of any agreement with the respondents.

The judgment is affirmed.

Griffin, J., and Marks, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 30, 1941.