JACK UTTER AND C. W. MOORE, APPELLANTS, v. JOHN JAY CASEY, ALSO KNOWN AS JOHN J. CASEY, RESPONDENT.

No. 4788

May 11, 1965

401 P.2d 684

*Sidney W. Robinson,* of Reno, for Appellants.

*Vargas, Dillon, Bartlett & Dixon,* and *Robert A. Groves,* all of Reno, for Respondents.

## OPINION

By the Court, BADT, J.:

This was an action to recover the sum of $59,583.75 alleged to be due appellants under an oral agreement wherein respondent agreed to employ appellants to procure for him by purchase certain ranching properties located in Montana, and that defendant would pay to said plaintiffs a commission of 2½% of the total contract price; that in the year 1959, pursuant to said contract of employment and through the agency of appellants, respondent purchased two ranch properties in Montana for the aggregate sum of $2,383,350 whereby the defendant became indebted to plaintiffs under said contract in the sum of $59,583.75.

After issue joined, a trial was had before the court without a jury.

In his written decision the trial judge stated that the brokerage contract was made in Montana where all the interested parties were present when the written contract of sale was entered into between the seller and Casey, that although appellants were licensed real estate brokers in Nevada they were not licensed in Montana, and that under Montana law the brokerage agreement

to pay a commission to unlicensed brokers was illegal and void.

The decision was followed by formal findings of fact, conclusions of law and judgment. The findings are to the effect that on April 30, 1959, when the contract of purchase was entered into, the parties hereto also entered into a brokerage contract in Montana; that the performance of the brokerage contract was intended to take place and did take place wholly within Montana; that neither appellant was a licensed real estate broker in Montana; and that by virtue of the Montana law existing in 1959 a brokerage contract to pay a commission to an unlicensed broker even if engaged in a single real estate transaction was void.

As conclusions of law the court determined that the validity and enforceability of the brokerage contract are governed by the laws of Montana and that such laws make the brokerage contract illegal and void. Judgment was entred in favor of respondent and against appellants. Appeal is from the judgment.

Appellants state that two basic legal questions are presented: (1) "whether or not a contract for personal services such as that involved in the instant proceeding can be enforced in the state where it is made, irrespective of where the real property may be situated"; and (2) whether or not under a construction of the Montana law a single transaction such as the one here involved would be excepted from the Montana statute applicable to real estate brokers.

Before the court can address itself to the first question which the appellants present, the court must dispose of appellants' assumption that the contract was made in the State of Nevada. If the court's finding that the brokerage contract was made in Montana and not in Nevada finds substantial support in the evidence, this disposes of appellants' first contention.

1. That there is a conflict in the evidence with reference to where the brokerage contract was made is at once evident. Appellants refer to the testimony of Jack Utter to support appellants' contention that the contract was made in Nevada. Utter testified to a conversation had at his office in Reno before leaving Reno for Elko.

No one else was present but Utter and Casey. Utter was asked to relate the substance of that conversation. He answered:

"A. Well, I had several listings in Elko, in the Elko County area, on different ranches which I took John out and showed the Wysong Ranch, the Seaman Ranch to him."

It is not clear that what followed was part of the conversation in Reno or part of the conversation on the automobile journey to Elko.

Asked to state the purpose of the trip, Utter said it was to "find pasture or find a ranch that was suitable to John Casey.

"Q. * * * Was anything said about compensation?

"A. Yes. John said that if we found the right thing he would pay me a commission.

"Q. Did he say what that commission would be?

"A. Well, 5 per cent."

This was categorically denied by Casey.

Moore joined them in Elko and the parties then flew over ranch properties in Elko County, Nevada, and in Idaho, and then flew to Montana. In Montana negotiations were making progress for the purchase of two extensive ranch properties. Utter reported back to Casey in Montana the progress that was being made, and testified:

"And at that time is when we made up and wrote down what we thought we might be able to do, and John signed it and said that this is what he would do.

"Mr. Casey said, 'Now, I'll pay your commission. You make the best deal that you can make for me, and I'll pay the commission.'" This conversation took place in Montana. Utter testifies to another conversation with Casey at which Chuck Moore and Ralph Scott were also present, at which the following took place:

"Well, he told us if we could wait until he sold these steers he had on the ranch that fall, that he would pay us, and we went along. This conversation was also in Montana. The reference to the instrument signed by Casey at that time was to plaintiffs' Exhibit B. A brief penciled memorandum to buy the "Hairpin Corp.—clear —all stock in corp., covering all assets—plus Cross

Ranch clear and all assets—gross price $2,375,000. Buyer pays ½ commission 2½% to Utter and Moore. Seller settles with Hagarty & Fox [Montana brokers]." This is followed by a list of the amounts and dates of payments to be made. It is not dated but apparently was made about the time of the memorandum agreement for the purchase by Casey of the Peterson Ranch from Herman R. Peterson and Hairpin Livestock Company, a Montana corporation for $1,369,956.03. This was followed by the recitals and amounts of the installment payments and a more detailed description of the lands, cattle, machinery and equipment, water, grazing rights, brands, etc. It recited that it was to be followed by a more detailed agreement covering such items as security, default, and other necessary items. It contained the following paragraph:

"9. It is understood that no commission shall be payable by the Seller to anyone as a result of this transaction. Buyer covenants that he was not induced to negotiate for this transaction nor introduced to it by any Realtor or Agent, except C. W. Moore and Jack Utter; and, in the event Seller should be held liable to anyone but [for?] any commission on the ground that Buyer was located by such person, then Buyer agrees to indemnify Seller against any such commission and hold Seller harmless therefrom."

This instrument was also executed in Montana.

Casey on defense testified: "Q. Did you at any time have a conversation with either Mr. Utter or Mr. Moore about paying a commission at Reno, Nevada? A. Absolutely not. It never was discussed where any of this would be paid. * * * Q. You say they talked to you about the Holland Livestock Ranch, and they mentioned the $5,000 commission. Maybe I have forgotten something. Was there anything else they mentioned? * * * A. Listing on the ranches, yes. Q. Which ranch? A. The Montana ranches."

The following took place on cross-examination by Mr. Robinson: "Q. Mr. Casey, where did you expect to pay this $5,000 commission that you were talking about? A. Dillon, Montana. Q. Why didn't you? A. I don't know. I guess I was too busy or something at the time

and there was never—they never acted like they needed it. Q. And they never agreed to accept it; isn't that true? A. Yes, they did agree to accept it. * * * Q. Now, you say that you told them that they would either take the $5,000 and expense money, or the deal would— A. No, that included the expense money. Q. Including expense money? A. Right. Q. Or the deal would go down the line? A. Right. Q. And yet you didn't pay it to them, did you? A. Not at that time. * * * Q. And this $5,000 was to cover their expenses? A. That's right, plus their time and trouble."

Utter denied that he had at any time agreed with Mr. Casey to take $5,000 for their time and trouble and expenses. Under the conflict above appearing, which conflict was resolved by the trial court in favor of the respondent and there being substantial evidence to support the findings above recited, it is not the function of this court to weigh the evidence. The finding that the brokerage contract was made in Montana will not be disturbed. The place of performance, both intended and actual, was also in Montana, and the property was located in Montana. Under these circumstances there can be no question but that the law of Montana will govern. Annot., 159 A.L.R. 226, 267; James v. Hiller, 85 Ariz. 40, 330 P.2d 999; Tillman v. Gibson, 44 Ga.App. 440, 161 S.E. 630; 11 Am.Jur. § 999; Conflict of Laws § 167.

2. The applicability or inapplicability of the "isolated transaction rule" to the case at bar, is determinative of this case. The Montana Brokerage Act was first enacted in 1921. Laws of Montana 1921, Ch. 195, Sec. 2, RCM 1921, Sec. 4958. From 1921 until 1957 the Montana Brokerage Act expressly provided that it did not apply to an isolated transaction. RCM 1947, Sec. 66–1903, provided in part: "The provisions of this act shall not apply to any person who purchases property for his own use or account, nor to any person making one single transaction a year, * * *." In Harbolt v. Hensen, 78 Mont. 228, 253 P. 257 (1927), the recovery of a commission was allowed on an isolated transaction. There the court relied on the express language of the statute.

In 1957 the statute was amended and the language expressly permitting an isolated transaction was deleted. Laws of Montana 1957, Ch. 129, p. 231, Secs. 1 and 2.

The trial court in our opinion properly found that the 1957 amendment to the Montana Brokerage Act (deletion of isolated transaction rule) was intended to eliminate from the law of Montana the so-called isolated transaction rule and to overrule by statute Harbolt v. Hensen, supra, as well as broaden the definition of a real estate broker and eliminate exceptions from the definition.

In Jager v. Grommesh, 77 N.W.2d 873 (N.D. 1956), the court held, quoting Sutherland, Statutory Construction, 3rd Edition, Section 1930:

" 'Because it is defined as an act that changes an existing statute, the courts have declared that the mere fact that the legislature enacts an amendment indicates that it thereby intended to change the original act by creating a new right or withdrawing an existing one. Therefore, any material change in the language of the original act is presumed to indicate a change in legal rights. The legislature is presumed to know the prior construction of terms in the original act, and an amendment substituting a new term or phrase for one previously construed indicates that the judicial or executive construction of the former term or phrase did not correspond with the legislative intent and a different interpretation should be given the new term or phrase. Thus, in interpreting an amendatory act there is a presumption of change in legal rights. This is a rule peculiar to amendments and other acts purporting to change the existing statutory law.'

"The presumption there discussed is applicable where a material provision in the original act has been omitted from the amendment."

The Supreme Court of Montana in State ex rel. Nagle v. Leader Co., 37 P.2d 561, 563 (Mont. 1934), adopted the same rule in the following language: "In construing

an act amendatory of a statutory provision, it is undoubtedly the rule that, when the Legislature declares an existing statute to be amended 'to read as follows,' as was done here, that body evinces the intention to make the new act a substitute for the amended statute, exclusively; only those portions of the old law repeated in the new are retained, and all portions omitted are repealed. State ex rel. Paige v. District Court, 54 Mont. 332, 169 P. 1180; State ex rel. Foot v. Burr, 73 Mont. 586, 238 P. 585; Hale v. Belgrade Co., 74 Mont. 308, 240 P. 371."

Appellants contend that the Montana legislative act of 1957, eliminating the exception which existed in the Montana statutes not requiring a broker's license when a single or isolated transaction was involved, does not have the effect of requiring a person performing a single or isolated transaction to have a license. They base this contention on the reasoning that "the repeal of said exception is not equivalent to an affirmative requirement that brokers have a license even where single or isolated transactions are involved." This in turn they support by the fact that the Montana legislature in 1963 made further enactments strengthening the brokers' act. We reject this reasoning and conclude that the 1963 act was a mere clarification of terms. The brokerage contract in question here was made in 1959 when the Montana act of 1957 was in effect.

Appellants further contend that Montana had in terms adopted the common law and that the original Montana licensing statute of 1921, with its isolated transaction exception, was but declaratory of the common law, and that when the 1921 statute was "repealed," it restored the common law with the isolated transaction exception included. Case law, including the cases hereinabove cited, do not sustain this contention, although some of the cases in reviewing brokerage licensing statutes held to be revenue measures have resulted in some confusion. This confusion does not appear to exist in a statute such as the Montana statute which is clearly a statute executed under the police power, regulatory in its nature,

and providing that its violation is a punishable offense. See Shorewood v. Standring, 19 Wash.2d 627, 144 P.2d 243; Yount v. Denning, 52 Kan. 629, 35 P. 207, 62 Kan. 217, 61 P. 803, 50 L.R.A. 103; Blair v. Security Trust & Savings Bank, 46 Cal.App.2d 665, 116 P.2d 646; Lucientes v. Bartholomae Oil Corp., 64 Cal.App.2d 443, 149 P.2d 28, and Annot. 169 A.L.R. 767, 772–775.

Judgment is affirmed.

COLLINS, D. J., and WINES, D. J., concur.